**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LESLIE M. MCNULTY,**

                              **Plaintiff,**                    **1:16-CV-843 (NAM/DJS)**

**v.**

**COUNTY OF WARREN, NEW YORK,**

                              **Defendant.**
_____

**Appearances:**

D'ORAZIO PETERSON, LLP
Giovanna A. D'Orazio, Esq., Of Counsel
125 High Rock Avenue
Saratoga Springs, New York 12866
_Attorneys for Plaintiff_

LEMIRE, JOHNSON & HIGGINS, LLC
Gregg T. Johnson, Esq., Of Counsel
April J. Laws, Esq., Of Counsel
2534 Route 9 - P.O. Box 2485
Malta, New York 12020
_Attorneys for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.   INTRODUCTION**

      Plaintiff Leslie McNulty commenced this action under the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101 _et seq._, asserting claims for discrimination and retaliation.

(Dkt. No. 1).  On March 23, 2018, Defendant County of Warren, New York filed a motion for

summary judgment, (Dkt. No. 40), which Plaintiff has opposed, (Dkt. No. 45).  For the reasons

that follow, Defendant's motion is granted in part, and denied in part.

## II. BACKGROUND

### A. Employment History

Plaintiff began working for Warren County in 1992 when she worked at the County's Women, Infants and Children program. (Dkt. Nos. 40-14, ¶¶ 1–2; 45-15, ¶¶ 1–2).[1] In 2000, Plaintiff began working for the County's Health Services Department as a full-time registered nurse in the Long-term Healthcare Program ("LHCP"). (Dkt. Nos. 40-14, ¶ 3; 45-15, ¶ 3). Plaintiff worked as a Community Health Nurse from 2000 until the end of her employment with Warren County in 2013. (Dkt. Nos. 40-14, ¶ 5; 45-15, ¶ 5).

As a Community Health Nurse, Plaintiff traveled out into the community to patients' homes to provide nursing care to patients receiving services from Warren County Public Health. (Dkt. No. 40-11, ¶ 3). Plaintiff used County-owned vehicles when visiting her patients. (*See* Dkt. No. 40-10, ¶ 12). In this role, Plaintiff's specific job duties included: (1) assessment of health care needs; (2) initial implementation of nursing care plans; (3) providing skilled nursing care and prescribing treatment to patients in their homes and clinics; (4) demonstrating nursing care to patients and their family members; (5) coordinating plans for services with other medical and clinical professionals, such as nutritionists, social workers, physical therapists, mental health care professionals, and physicians; (6) counseling and guiding individuals and family members towards self-help in recognition and solution of physical, emotional, and environmental health problems; and (7) maintenance of the physical and mental condition commensurate to the demands of the position. (Dkt. No. 40-7, p. 2).

Plaintiff's last assignment with Warren County was as a full-time registered nurse with the County's Certified Home Health Agency ("CHHA"). (Dkt. No. 40-10, ¶ 3). Between 2012

---

[1] All citations to documents in the record refer to the page numbers identified on the CM/ECF page stamp.

and 2013, Plaintiff performed job functions under both the CHHA and LHCP programs while the LHCP was being phased out by the New York State Department of Health. (*Id*., ¶¶ 3–4). All Warren County employees transitioning from LHCP to CHHA had two supervisors during that time. (*Id*., ¶ 4). Under LHCP, Plaintiff's direct supervisor was Mary Lamkins. (*Id*.). When Plaintiff was transferred to the CHHA program, she was also supervised by Valerie Whisenant. (*Id*.). As Plaintiff's direct supervisors, Ms. Whisenant and Ms. Lamkins reported directly to the County's Assistant Director for Patient Services, Sharon Schaldone. (Dkt. No. 40-10, ¶ 5). Ms. Schaldone's job duties included providing quality assurance for the LHCP and CHHA programs including medication documentation and billing review. (Dkt. No. 40-12, ¶ 4). Ms. Schaldone reported all supervisory concerns to her supervisor, Patricia Auer, the Public Health Director for Warren County Health Services. (*Id*., ¶¶ 2, 5).

## B. Medical History and FMLA Leave

At all relevant times, Plaintiff suffered from depression and alcoholism. (Dkt. No. 1, ¶ 11). From December 2011 until January 2012, Plaintiff took her first medical leave of absence under the Family and Medical Leave Act ("FMLA") to seek treatment for depression and alcoholism. (Dkt. Nos. 40-14, ¶ 20; 45-15, ¶ 20). Defendant was aware that Plaintiff's first FMLA leave was to seek treatment for depression and alcoholism. (*Id*.). Plaintiff later took a second medical FMLA leave of absence to seek additional treatment for depression and alcoholism from July 2012 until October 2012. (Dkt. Nos. 40-14, ¶ 22; 45-15, ¶ 22).

Pursuant to Section 825.30 of the FMLA, the County required Plaintiff to provide medical certification attesting to her ability to perform her core job functions before she returned to work from her second FMLA leave. (Dkt. No. 40-10, ¶ 7). On September 18, 2012, a Physician Assistant approved Plaintiff to return to full work duty without restrictions on or after

October 1, 2012. (Dkt. No. 45-8, p. 3). Defendant then requested additional medical documentation and clearance before allowing Plaintiff to return to work. (Dkt. No. 45-14, ¶ 20). On October 4, 2012, Dr. Bryan Smead approved Plaintiff's return to work without restrictions on or after October 9, 2012. (Dkt. No. 45-8, p. 1). According to Dr. Smead's report:

> Leslie [McNulty] is able to, under supervision, perform public health nursing activities involving responsibility for assessment of health needs and developing the plan of care for individuals and families.
>
> This includes skilled nursing care and prescribed treatments to patients in their homes and clinics. She can lead a team of peers and subordinates providing nursing care and evaluate the effectiveness of team activities; provide for the continuity of care by promoting referrals to other community agencies, coordinate plans for service with nutritionists, social worker, physical therapists, physicians and other professional workers concerned with individual and family health care.
>
> She can counsel and guide individuals and families towards self-help in recognition and solution of physical, emotional and environmental health problems, provide nursing services in clinics and schools as assigned. She can teach classes, address groups, and participate in community planning related to nursing and health, coordinate investigate, follow up, reporting and education of communicable and vaccine preventable diseases. Pt is able to drive independently to and from work for her nursing abilities; may return to work 10-09-2012.

(*Id.*).

## C.  Alleged Performance Issues

While Plaintiff was on her second FMLA leave, other nurses assumed her caseload and had access to Plaintiff's client notes and billing entries. (Dkt. Nos. 40-14, ¶ 25; 45-15, ¶ 25). During that leave, Plaintiff's supervisors began receiving reports of various performance issues with regard to Plaintiff's compliance with required recordkeeping and billing procedures. (Dkt. No. 40-10, ¶ 5). In August 2012, while Plaintiff was out on FMLA leave, Director Auer

consulted the County Attorney regarding the possibility of placing Plaintiff on involuntary medical leave under Section 72 of New York State Civil Service Law ("Section 72"). (*Id.*).

On October 15, 2012, just days after returning from her second FMLA leave, Plaintiff met with her supervisors, Mses. Schaldone, Whisenant, and Lamkins, to discuss her work performance. (Dkt. No. 40-12, ¶ 7). The supervisors informed Plaintiff that the nurses covering Plaintiff's patients and Plaintiff's direct supervisors observed numerous deficiencies in her medical charting and billing records. (*Id.*). Specifically, the alleged deficiencies in Plaintiff's job performance included: (1) inaccurate and untimely record keeping; (2) incomplete medical file notes resulting in a lack of information regarding critical patient medical issues; (3) routine inability to manage patients' medications resulting in patients receiving incorrect medications and dosages; and (4) inability to prioritize delivery of patient care to patients with the most critical care needs over patients with non-critical needs. (Dkt. No. 40-10, ¶ 10). Plaintiff's supervisors reminded her of the County's job requirements and counseled Plaintiff on how to improve her performance in the future. (*Id.*, ¶ 6). The supervisors advised Plaintiff that her documentation would be reviewed by one of her supervisors daily. (*Id.*).

On October 22, 2012, Mses. Auer, Schaldone, and Lamkins met with Plaintiff and one of Plaintiff's family members to discuss "any concerns she may have had about her job performance and to offer [Plaintiff] assistance in implementing a plan so she could be a successful nurse." (Dkt. Nos. 40-10, ¶ 8; 45-9, p. 41:19–24). According to Director Auer, "Plaintiff seemed to understand what was expected of her during this meeting." (Dkt. No. 40-10, ¶ 8).

On October 24, 2012, Director Auer provided Plaintiff with a memorandum highlighting important points discussed during the October 22nd meeting. (*See* Dkt. No. 40-4). Director

Auer's memorandum instructed Plaintiff "to come directly to her to address any issues or concerns she may have with any of her direct superiors." (*Id*.). Director Auer's memorandum does not document any specific criticisms or errors found in Plaintiff's work. (*Id*.).

Following Plaintiff's meetings with her supervisors on October 15 and October 22, the County identified a series of alleged deficiencies, including:

- On November 6, 2012, Plaintiff was performing a home visit when, during patient assessment, the patient was in jeopardy of falling to the floor. The agency procedures for this type of situation is to immediately call for EMS to assist. However, Plaintiff did not follow procedure and, instead, contacted her supervisor while leaving this patient in a compromised position. Plaintiff also left this same patient unattended when EMS arrived, and Plaintiff did not contact the family to check on the patient's status later in the day.

- On November 10, 2012, Plaintiff saw a patient for wound care. Plaintiff referred care to home care aids and LPN's but did not follow-up with the care provided nor the outcome of the patient's doctor visits. Additionally, Plaintiff did not document any of the changes to the patient's file. This lack of communication was not only against agency procedures and federal, state and regulatory procedures, but jeopardized the patient's care.

- During the weekend of November 11, 2012, Plaintiff was assigned several home visits. During these visits, Plaintiff demonstrated an inability to determine the priority of care (i.e., she did not properly prioritize a patient with fresh surgical needs over others with more routine treatment needs). Plaintiff was also unable to prioritize patient care to see a patient that had critical care doctors' orders (a patient with unstable pulse oxygen reading identified the previous day) over other, patients with non-critical needs.

- On November 12, 2012, Plaintiff visited a home care patient with a fresh postsurgical wound with staples and hospital discharge orders of no bath or shower. Plaintiff documented and verbally confirmed to her supervisors that she did instruct the patient's spouse to wash the staple line daily with saline and change the dressing every day. This misinformation caused the potential for serious complications of the patient's wound. A nurse of Plaintiff's level should have understood basic wound care.

- On November 14, 2012, Plaintiff treated a patient who had low blood oxygen readings. Plaintiff contacted a supervisor and was directed to contact the treating provider. Plaintiff called the treating provider and left a message, but never follow-up on the outcome of the patient's condition or the need for a treatment change.

- On November 21, 2012, it was discovered that Plaintiff was not following agency procedure, as she had not seen a patient that required care two-to-three times per month in over a month's time.

(Dkt. No. 40-10, ¶ 10). Plaintiff disputes each of the County's determinations regarding these alleged mistakes. (*See* Dkt. No. 45-14, ¶¶ 29–33). According to Plaintiff: "Although the County has attempted to make it seem like I was making serious mistakes, in reality, any charting issues they are relying on were merely clerical issues or caused by the delay in having to wait for my supervisors to sign off on my documentation." (*Id.*, ¶ 31). Plaintiff denies Director Auer's characterization of her performance. (*Id.*, ¶ 33).

### D. Complaints of Workplace Harassment and Retaliation

According to Plaintiff, once she returned from FMLA leave, "there was a significant change in the way I was being treated as compared to before I went out on leave. It was soon very clear that the County did not want me to continue working there." (Dkt. No. 45-14, ¶ 21). Plaintiff claims that, "Defendant only began to accuse Plaintiff of being unable to do her job after she took leave." (Dkt. No. 45-16, p. 5). Plaintiff states that during the October 22nd meeting with Director Auer and Ms. Schaldone, she complained that she was being "subjected to unreasonable supervision, bullied and harassed." (Dkt. No. 45-14, ¶ 5). Moreover, Plaintiff claims to have expressed to her supervisors that "[she] felt that [she] was being forced out of [her] position." (*Id.*). Plaintiff also expressed that she thought "the County's actions were because of [her] recent medical leave." (*Id.*). Plaintiff claims that: "When I expressed that the County was attempting to force me out of my position, Ms. Schaldone replied 'whatever' in an

aggressive and dismissive tone." (*Id.*, ¶ 6). During the October 22nd meeting, Plaintiff's family member informed Director Auer that Plaintiff intended to file a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 45-9, pp. 40–41:7–15). Director Auer recalls that the October 22nd meeting was "adversarial." (*Id.*, p. 41:14–15).

Plaintiff was never cited for any disciplinary issues or performance problems prior to her return from FMLA leave in October 2012. (Dkt. Nos. 45-14, ¶ 23; 45-9, p. 16:1–5). Plaintiff claims to have been subjected to a greater level of scrutiny, including being cited for performance issues for the first time in her 13-year employment with the County. (Dkt. No. 45-14, ¶¶ 23, 35). Regarding the alleged performance issues, Plaintiff states: "When I returned from leave, not only was I subjected to increased supervision, but I had to follow documentation requirements for Medicare (previously most of my patients were on Medicaid). I was not formally trained with respect to Medicare documentation." (*Id.*, ¶ 42).

Moreover, Plaintiff states that Ms. Schaldone "made suggestive comments about alcohol and my disability in my presence." (Dkt. No. 45-14, ¶ 45). According to Plaintiff:

> [A]fter the October 22 meeting during which I complained, Ms. Schaldone, in my presence, stated 'I am so pissed off, I can't wait to go home and have three martinis.' On another occasion, in my presence, Ms. Schaldone referenced wanting a 'double Stoli.' Given Ms. Schaldone's demeanor, it was clear that these comments were directed at me.

(*Id.*, ¶ 46). According to Plaintiff, she also requested a copy of her employment file in November 2012 "[b]ecause of what was going on at work," and Ms. Schaldone said, in Plaintiff's presence, "Now she wants her employment record. I have spent enough time on this shit." (*Id.*, ¶ 47).

In addition to these alleged comments, Plaintiff claims to have received excessive written criticism from her reviewing supervisors by e-mail. (*See* Dkt. No. 45-14, ¶¶ 34–40). When

Plaintiff returned to work after the second FMLA leave, Ms. Schaldone "reviewed each and every documentation that [Plaintiff] made on a daily basis. [Plaintiff's] work had never been subjected to this type of scrutiny prior to [her] medical leave." (*Id*., ¶ 35). According to Plaintiff, "Ms. Schaldone emailed me so frequently that it interfered with my ability to do my job. I recall receiving multiple emails from Ms. Schaldone per day." (*Id*., ¶ 39). Plaintiff states that: "Ms. Schaldone would also critique my work even after my other two supervisors signed off on it." (*Id*., ¶ 36).

Plaintiff recalls that: "Ms. Schaldone often emailed me about items that were missing from my chart. However, due to the increased scrutiny I was under, I had to have my other supervisors sign off on my entries first. For this reason, there was a delay before items would appear on the chart and when I could advise Ms. Schaldone that this issue had been resolved." (Dkt. No. 45-14, ¶ 38). Plaintiff suggests that since her direct supervisors, Mses. Whisenant and Lamkins, had to sign off on Plaintiff's charting, "there was sometimes a delay in what was showing up on my chart. [Ms.] Schaldone would then accuse me of charting problems even though I had to wait for this sign-off." (*Id*., ¶ 43). In sum, Plaintiff claims that: "The County's actions made it impossible for me to do my job." (*Id*., ¶ 54).

On November 19, 2012, Plaintiff filed an initial intake questionnaire with the EEOC, alleging discriminatory treatment based on her disabilities and documenting several experiences of alleged discrimination. (*See* Dkt. No. 45-14, pp. 11–20). On November 26, 2012, Plaintiff filed a complaint through her union representative "memorializing what was going on at work and the fact that I had complained during the October meeting." (Dkt. No. 45-14, ¶ 9, pp. 21–23). Specifically, Plaintiff's e-mail correspondence to the union stated that: "Since my return

from medical leave (10/9/2012) I have experienced intimidation, retaliation, harassment and bullying from the entire supervisory staff . . . ." (Dkt. No. 45-14, p. 22). Plaintiff further stated:

> I am aware that I have to learn new documentation with the new patients I am caring for. I am willing and able to master this as I am a smart woman and a good nurse. What I am unable to do is work in this hostile and threatening environment. I have a progressive and life threatening disease which is currently under control; however, these hostile working conditions are not safe for me. Even without my diagnosis these working conditions are untenable for anyone.

(*Id.*).

Plaintiff claims that: "The County also started having a supervisor accompany me to my patient visits. At the time I made an inquiry to the EEOC in November 2012, I had been accompanied twice since my return to work in October. Prior to my leave, I was accompanied once a year at most." (Dkt. No. 45-14, ¶ 45). Plaintiff states: "When I was assigned supervisors to accompany me on my visits, I specifically asked if there were any clinical concerns. Both Patricia Auer and Valerie Whisenant told me there were not." (*Id.*, ¶ 32).

## E. Involuntary Section 72 Leave

Following Plaintiff's alleged performance issues, Director Auer claims to have "had concerns that those issues were still affecting Plaintiff's ability to perform the essential functions of her job . . . ." (Dkt. No. 40-10, ¶ 12). Director Auer states that she "observed Plaintiff acting in an anxious manner and witness[ed] her showing signs of tremors while at work." (*Id.*). Director Auer explained that she "had concerns that Plaintiff had relapsed, as a nurse myself, my visual observations were very concerning." (*Id.*). Director Auer "was also concerned about the County's liability, as Plaintiff would be driving to her client meetings in a County-owned vehicle." (*Id.*).

On December 6, 2012, the County notified Plaintiff by letter that it was placing her on an involuntary Section 72 medical leave. (Dkt. No. 40-5). The County's leave notice, written by Director Auer, stated:

> As the Director of Public Health Department I continue to have serious concerns about your present ability to perform job duties as RN Community Health Nurse for Warren County. These concerns are in large part related to a prior disability/illness diagnosis made by your physician Dr. Bryan Smead. Confirmation of the disability/illness is on file with the Warren County Self-Insurance Office. The specific concerns related to your job performance include, but are not necessarily limited to, deficiencies with case management and skilled clinical judgment of patients, poor time management, inability to complete visit orientation including patient care plans, medications and inability to submit medical orders in a timely and appropriate manner, inappropriate billing for home visit services, difficulty with independent/appropriate judgment, inability to meet Agency productive standards particularly in regard to the number of the referrals handled, refusal to accept and follow through with Supervisory requests regarding case management and documentation and the scope of your overall job performance is fragmented and is not improving.
>
> The aforesaid concerns and deficiencies, coupled with your physician's earlier statements diagnosing a disabling condition, lead me to determine that your condition is chronic and that you are not medically fit to perform the important duties of a RN Community Health Nurse at this time. Specifically, I have determined that there is probable cause to believe that your continued presence on the job represents a potential danger to other persons or property or would severely interfere with department operations.
>
> In accordance with this finding, and pursuant to my authority under Section 72(5) of the New York State Civil Service Law, you are hereby placed on an involuntary leave of absence, without pay, effective Monday, December 10, 2012. You are entitled to draw all accumulated, unused sick leave, vacation, overtime and other time allowances standing to your credit.

(Dkt. No. 40-5, p. 2). Director Auer states that she "hoped that this leave would allow Plaintiff to stop abusing alcohol and obtain further medical and/or psychological care, so that Plaintiff's

job performance with the County could improve once she was well enough to return to work."
(Dkt. No. 40-10, ¶ 12).

After receiving the Section 72 notice letter, Plaintiff was "escorted to [her] car by police in front of friends and coworkers who [she] had worked with for many years." (Dkt. No. 45-14, ¶ 49). Plaintiff describes Director Auer's assessment that her alleged mistakes were attributable to alcoholism as "completely unfounded," and states that: "At the time I returned from [the second FMLA] leave, I was cleared by my doctor and had successfully completed a treatment program." (*Id.*, ¶ 40). Plaintiff denies that she ever exhibited tremors or anxiety as described by Director Auer. (*Id.*, ¶ 41).

On January 21, 2013, while out on Section 72 leave, Plaintiff underwent an examination by a County-appointed physician, who determined that Plaintiff was "fit to return to work as an RN." (Dkt. No. 45-7). Plaintiff states that: "During the time period prior to and while I was on Section 72 leave, I became very distressed at the way the County was treating me and lost over 12 pounds, had anxiety and could not sleep. In addition to being escorted by [police] to my car, the Section 72 evaluation was very stressful as I was examined by a doctor I had no familiarity with [my] very personal matters and [I] was required address 17 accusations of performance issues and mistakes by the County's insurance department." (Dkt. No. 45-14, ¶ 51). Plaintiff states that: "[B]ecause of the County's actions in trying to use disciplinary procedures to push me out, I could lose my license. That concern was raised by the County's physician at my Section 72 evaluation." (*Id.*, ¶ 54).

Plaintiff's Section 72 leave was unpaid, and she went unpaid from at least December 7, 2012 through mid-to-late January 2013. (*Id.*, ¶ 50). Plaintiff states that: "After my union intervened and the County's doctor cleared me to return to work, I was eventually reimbursed

for my back pay." (*Id.*). Plaintiff's receipt of backpay was memorialized in a January 24, 2013

e-mail correspondence from County Attorney Martin Auffredou to Director Auer and others,

instructing that:

> The [independent medical examiner ("IME")] indicates that Ms. McNulty is fit for service. My understanding is that she returned to work today. In accordance with Civil Service Law Section 72 and per our prior discussions, please arrange for Ms. McNulty to receive any and all back pay dating back to the commencement of her leave which I understand began on December 10, 2012. To the extent that she elected use of vacation or sick leave benefits during that time period, those benefits should be reinstated.

(Dkt. No. 45-12, p. 1).

### F. EEOC Complaint

On December 12, 2012, shortly after being placed on Section 72 leave, Plaintiff filed a

formal complaint of discrimination and retaliation against Warren County with the EEOC. (Dkt.

No. 45-1). Plaintiff's EEOC complaint states that:

> I believe that my employer is engaged in a course of conduct that is designed to end my employment. I believe that my employer's actions are based on my disabilities, including my record of disability and my employer's perception of my disabilities. I believe that my employer's actions are in retaliation for my taking medical leave because of my disabilities.

(*Id.*, p. 2).

### G. Return from Section 72 Leave and Resignation

On January 24, 2013, Plaintiff returned to work following the Section 72 leave. (Dkt.

No. 40-12, ¶ 9). Upon her return, Plaintiff attended a meeting with Mses. Schaldone, Auer,

Whisenant, and Lamkins at which Plaintiff was informed that: "[n]othing has changed" and that

Plaintiff would continue to receive the same level of supervision and review that she received

prior to her Section 72 leave. (Dkt. No. 45-14, p. 29). According to Plaintiff:

By the County's actions since my return from leave and when it put me out on Section 72 leave, it was clear to me that the County no longer wanted me to work there. Therefore, during my leave, I considered resigning.

I returned to work in a good faith effort to see if the work environment would change, however I was expressly told by Sharon Schaldone, in a meeting also attended by Patricia Auer and my two other supervisors, that 'nothing has changed.'

The County's actions made it impossible for me to do my job. They also made it clear that they would attempt to use the Civil Service Law to push me out of my position. There was also a serious concern that, because of the County's actions in trying to use disciplinary procedures to push me out, I could lose my license. That concern was raised by the County's physician at my Section 72 evaluation.

Therefore, once I was unequivocally told that nothing was going to change, I was forced to resign.

(Dkt. No. 45-14, ¶¶ 52–55).

On January 28, 2013, four days after returning from Section 72 leave (two business days), Plaintiff delivered her resignation letter to the County, stating:

After much thought and consideration, I have decided to submit my resignation as a Public Health Nurse in the Warren County Office. I have truly been grateful for the opportunity to provide nursing care to some of the County's most fragile population, and believe my service to patients had been professional, meaningful and compassionate. My sense of patient care has been affirmed by colleagues and health care professionals both within and outside the office setting. This is very personally satisfying.

As indicated by Personnel Policies, I am providing the required two week notice prior to my leaving service at Warren County Public Health. The final date of my employment at WCPH will be February 8, 2013.

(Dkt. No. 40-2, p. 2).

In the time between Plaintiff's return from Section 72 leave and her resignation, Plaintiff's work performance was not criticized by her supervisors either verbally or through written correspondence, and she was not issued any type of discipline. (Dkt. No. 40-12, ¶ 9).

## H. EEOC Determination

On March 15, 2015, the EEOC issued a determination regarding Plaintiff's Complaint, concluding that:

> The investigation revealed that the adverse treatment [Warren County] subjected [Plaintiff] to from October 2012 to January 2013 was serious, was directly related to her disabilities and caused a hostile work environment for [Plaintiff]. Next, the investigation revealed that [Warren County] had reasonable concerns about risks to the safety of patients but, before putting [Plaintiff] on leave, [Warren County] did not look for possible accommodations which might have reduced or eliminated those risks. Finally, the investigation revealed that [Plaintiff] quit because [Warren County] was subjecting her to unlawful employment practices.
>
> Based on the evidence and the analysis summarized above, I have determined that [Warren County] violated the ADA by allowing a hostile work environment, by placing [Plaintiff] on involuntary leave, by requiring [Plaintiff] to take a medical exam as a condition of employment and by constructively discharging [Plaintiff].

(Dkt. No. 45-2, pp. 1–2).

## III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). Further, "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and the grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citing *Dister v. Continental Group, Inc*., 859 F.2d 1108, 1114 (2d Cir. 1988)). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp*., 352 F.3d 775, 780 (2d Cir. 2003).

The Second Circuit instructs that courts should be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question." *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 255 (2d Cir. 2009) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). Moreover, because direct evidence of an employer's discriminatory intent will rarely be found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp*, 118 F.3d at 110 (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). Nevertheless, "even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Id*. (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

## IV. DISCUSSION

Plaintiff's Complaint asserts two distinct causes of action against the County stemming from her treatment following her return from FMLA leave: (1) discrimination in violation of the ADA; and (2) retaliation in violation of the ADA. (*See* Dkt. No. 1).[2] In moving for summary judgment, Defendant argues that: (1) Plaintiff's discrimination claim fails because she did not suffer an adverse employment action and was not otherwise subjected to a hostile work environment; and (2) Plaintiff's retaliation claim fails because "there is no evidence that Plaintiff was subject to an adverse employment action or that there was a causal connection between the protected activity and the [alleged] adverse action." (*See generally* Dkt. No. 40-13). The Court will consider each of Plaintiff's ADA claims in turn.

### A. ADA Discrimination Claim

Plaintiff alleges that Warren County discriminated against her in violation of the ADA when it: (1) put her on involuntary, unpaid Section 72 leave; (2) gave her an improper medical evaluation as a condition of continued employment; and (3) engaged in activities which created a hostile work environment and caused her constructive discharge. (*See* Dkt. Nos. 1, pp. 6–7; 45-16, p. 11).

Under Title I of the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims alleging disability

---

[2] The Second Circuit has "not yet decided whether hostile-work-environment claims are cognizable under the ADA." *Dollinger v. New York State Ins. Fund*, 726 F. App'x 828, 831 (2d Cir. 2018). Although Plaintiff's Complaint did not allege hostile work environment as a separate claim, it is clearly implied, and the Court will analyze the claim separately after her discrimination claim. *See Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 292 (W.D.N.Y. 2014) ("hostile work environment claims are not analyzed using the McDonnell Douglas three-part burden-shifting test").

discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). First, Plaintiff must establish a prima facie case of discrimination under the ADA. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). If an employee establishes a prima facie case, "the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Id.* The Court will assess Plaintiff's discrimination claim at each step of the *McDonnell Douglas* test.

### 1. Prima Facie Case

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) the defendant is subject to the ADA; (2) plaintiff suffers from a disability within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability. *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citing *Sista*, 445 F.3d at 169). Plaintiff's burden at the prima facie stage is *de minimis*. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). There is no dispute that Warren County is subject to the ADA, and that Plaintiff suffers from depression and alcoholism—disabilities within the meaning of the ADA. (*See generally* Dkt. Nos. 40-13; 45-16). Therefore, the only remaining questions with regard to the prima facie case are: (1) whether Plaintiff was qualified to perform essential job functions; and (2) whether Plaintiff suffered adverse employment actions because of her disability.

First, with regard to Plaintiff's qualifications, Defendant appears to challenge Plaintiff's fitness to perform essential functions of the job based on alleged "misconduct" caused by her alcoholism. (*See* Dkt. No. 40-13, pp. 23–25). Defendant notes that employers may discharge an employee for disability-caused misconduct where that misconduct is the result of drug or alcohol abuse. (*Id.*, pp. 24–25, citing 42 U.S.C. § 12114(c)(4)). Defendant suggests that Plaintiff cannot establish a prima facie case because her alleged performance issues were caused by alcoholism. (*Id.*). Nevertheless, Defendant has not offered any evidence that Plaintiff's alleged poor performance was actually caused by alcoholism, as opposed to depression, or any other reason. The only evidence linking Plaintiff's alcoholism and her job performance is Director Auer's conclusory statement that she had "observed Plaintiff acting in an anxious manner and witness[ed] her showing signs of tremors while at work." (Dkt. No. 40-10, ¶ 12). In response, Plaintiff states that Defendant's allegation that her alleged mistakes were because of alcoholism is "completely unfounded," and notes that she had completed a treatment program and been cleared by her doctor before she returned to work. (Dkt. No. 45-14, ¶ 40). Therefore, at a minimum, there is at least an issue of material fact as to whether Plaintiff's alcoholism caused her alleged performance issues. In any event, evidence supporting Plaintiff's qualification for the position includes a 13-year work history with the County, during which Plaintiff had previously received positive performance reviews. (*See* Dkt. No. 45-14, ¶¶ 23–24, pp. 32–45). Accordingly, Plaintiff has satisfied her burden of demonstrating her qualification for the position.

Next, Plaintiff claims that she suffered three adverse employment actions because of her disability: (1) the involuntary, unpaid Section 72 leave; (2) the improper medical exam; and (3) the constructive discharge. (Dkt. No. 45-16, p. 11). An "adverse employment action [is] a

materially adverse change in the terms, privileges, duration and conditions of employment." *Treglia*, 313 F.3d at 719. A materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Patrolmen's Benevolent Ass'n of the City of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002). Materiality "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). The plaintiff must also present evidence that "the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).

### A. Involuntary Section 72 Leave and Exam

First, Plaintiff alleges that Defendant discriminated against her by placing her on unpaid, involuntary Section 72 leave on or about December 6, 2012. (Dkt. No. 1, ¶ 24). Plaintiff further alleges that she was then subjected to an improper Section 72 medical exam on or about January 21, 2013, as a condition of continued employment. (*Id.*, ¶¶ 27–28). Defendant argues that "no reasonable fact finder could conclude that Plaintiff's placement on Section 72 leave or requesting additional documentation to attest to her fitness to perform her essential job functions satisfies the requirement of an adverse action for purposes of an ADA claim." (Dkt. No. 40-13, p. 28).

Notably, the Second Circuit has held that a medical exam by itself does not rise to the level of an adverse employment action. *See Baum v. Rockland County*, 161 F. App'x 62, 64 (2d Cir. 2005) ("On the facts of this case, the district court was correct to hold, as a matter of law, that the § 72 exam did not constitute an adverse employment action, as we have defined that

phrase in the context of ADEA and ADA retaliation."). However, in some cases, this Court has recognized that "the combination of [a Section] 72 exam *and* involuntary, unpaid leave constitute[s] a 'materially adverse change' to [a plaintiff's] terms and conditions of her employment." *O'Toole v. Ulster County*, No. 12-CV-1228, 2014 WL 4900776, *10, 2014 U.S. Dist. LEXIS 138045, *28–29 (N.D.N.Y. Sept. 30, 2014).

The record shows that the County placed Plaintiff on unpaid Section 72 leave *prior* to a Section 72 examination by a doctor—a departure from the typical procedural requirements. *See* N.Y. Civ. Serv. Law § 72(1) (stating that: "If, upon [ ] medical examination, [a] medical officer shall certify that such employee is not physically or mentally fit to perform the duties of his or her position, the appointing authority shall notify such employee that he or she may be placed on leave of absence."). Instead, the County invoked Section 72(5), which provides that an employee may only be placed on immediate involuntary medical leave, prior to an examination, if "there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons or property." *Id*. § 72(5). However, there are issues of material fact as to whether Plaintiff's alleged performance issues were sufficiently severe and dangerous to compel her placement on immediate involuntary leave, as discussed above.

In any event, before an exam was performed, Plaintiff was placed on involuntary, unpaid Section 72 leave. (*See* Dkt. Nos. 45-12; 45-14, ¶ 50). After being placed on leave, Plaintiff recalls that she "became very distressed at the way the County was treating me and lost over 12 pounds, had anxiety and could not sleep . . . . the Section 72 evaluation was very stressful as I was examined by a doctor I had no familiarity with about very personal matters . . . ." (Dkt. No. 45-14, ¶ 51). The County-selected medical examiner later found that she was fit for duty, (*see* Dkt. No. 45-7), and despite ultimately receiving backpay, she was "not paid from at least

December 7, 2012 through mid to late January 2013," (Dkt. No. 45-14, ¶ 50). The fact that Plaintiff was later awarded backpay after her union intervened does not render the change immaterial. *See Burlington N. and Santa Fe Ry. Co. v. White.,* 548 U.S. 53, 72–73 (2006) (holding that a thirty-seven day involuntary unpaid leave could constitute adverse employment action under Title VII, even though employee later received backpay); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) (holding that one-week suspension without pay is adverse action, even if pay is later reimbursed, because plaintiff "at least suffered the loss of the use of her wages for a time"). Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that her placement on Section 72 leave, in combination with the possibly improper medical exam, materially changed the conditions of Plaintiff's employment, and thus amounted to an adverse employment action.

Moreover, Plaintiff has also adduced evidence that this adverse action took place under circumstances giving rise to an inference of discrimination. Defendant argues that "Plaintiff is unable to show disparate treatment that gives rise to an inference of discrimination. (Dkt. No. 40-13, p. 28). However, evidence of disparate treatment is only one way to raise an inference of discrimination. *McGuinness v. Lincoln Hall, of Lincolndale, New York 10540*, 263 F.3d 49, 53 (2d Cir. 2001) (citing *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)). Notably, the Section 72 leave and exam followed Schaldone's alleged comments about drinking. At best, those comments were insensitive to Plaintiff's disability, and they could be viewed as showing discriminatory animus. *See Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 56–57 (2d Cir. 1998) (reasoning that stray remarks or a sudden downturn in performance reports are not sufficient standing alone, but may "support a jury verdict of discrimination" when they are combined with other indicia of discrimination); *see also Eka v. Brookdale Hosp. Med. Ctr.*, 247

F. Supp. 3d 250, 265–68 (E.D.N.Y. 2017) (holding that a manager's discriminatory remarks, when coupled with other indicia of discrimination within the overall sequence of events, may establish an inference of discrimination). The decision to put Plaintiff on leave without first conducting a medical exam could also support an inference of discrimination. Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably find a causal connection between her disability and the adverse action.

Therefore, Plaintiff has met her prima facie burden to establish that her involuntary Section 72 leave and exam qualified as an adverse action under the ADA. *See O'Toole*, 2014 WL 4900776, at *10, 2014 U.S. Dist. LEXIS 138045, at *28–29; *see also Manners v. New York State Dept. of Envt'l Conservation*, No. 14-CV-810, 2015 WL 4276465, *12, 2015 U.S. Dist. LEXIS 90828, at *29–30 (N.D.N.Y. July 14, 2015) (holding that a Section 72 examination may qualify as an adverse action when combined with involuntary, unpaid leave).

### B. Constructive Discharge

As to the alleged constructive discharge adverse action, Defendant argues that "the actual harassment Plaintiff claims to have experienced - scrutiny of her job performance, off-hand comments about drinking alcoholic beverages, multiple supervisors, meetings with her supervisors to discuss her job performance - do not rise to a level of constructive discharge." (Dkt. No. 40-13, p. 21). In response, Plaintiff claims she was forced to resign because she "was subjected to immediate criticism of her work and a barrage of counseling and scrutiny," and she suggests that "Defendant's actions also caused a legitimate concern that, if nothing changed and Defendant continued to use the Civil Service Law to push Plaintiff out of her position, she could lose her license." (Dkt. No. 45-16, p. 13).

"An adverse employment action may [ ] take the form of a constructive discharge, which occurs 'when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Caskey v. Cty. of Ontario*, 560 F. App'x 57, 59 (2d Cir. 2014) (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)). "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff 'must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Fincher v. Depository Tr. and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Constructive discharge requires evidence that: (1) the employer acted deliberately or intentionally in bringing about the complained of work conditions; and (2) that the conditions were "intolerable." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 229–30 (2d Cir. 2004). To meet the first requirement, a plaintiff must demonstrate, that the employer acted deliberately, and not merely negligently or ineffectively, in bringing about the intolerable work conditions. *Id*. Next, the plaintiff must also show that, when assessed objectively, a reasonable person in the employee's position would have felt compelled to resign. *Id*. at 230.

In this case, there is evidence that, upon Plaintiff's return from FMLA leave, she was increasingly subjected to intense criticism of her work by her supervisors. (*See*, *e.g.*, Dkt. No. 45-14, ¶¶ 35–36). Plaintiff states that her "work had never been subjected to this type of scrutiny prior to my medical leave." (*Id.*, ¶ 36). Plaintiff further states that Ms. Schaldone criticized her work even after two other supervisors signed off on it, and that she received so much criticism from Ms. Schaldone, with multiple e-mails every day, that it interfered with her ability to do her job. (*Id.*, ¶ 39). Moreover, "Ms. Schaldone also made suggestive comments

about alcohol and [Plaintiff's] disability in [Plaintiff's] presence." (*Id.*, ¶ 45). Plaintiff states that Ms. Schaldone made harassing remarks referencing wanting "three martinis" and a "double Stoli," despite Ms. Schaldone's knowledge of Plaintiff's struggle with alcoholism. (*Id.*, ¶ 46). According to Plaintiff, "[b]ecause the County was interfering with my ability to do my job, I complained . . . . Following these complaints, I was put out on Section 72 leave." (*Id.*, ¶ 48).

Immediately following her placement on Section 72 leave, Plaintiff recalls being "escorted to [her] car by police in front of friends and coworkers who [she] had worked with for many years." (*Id.*, ¶ 49). According to Plaintiff, "[b]y the County's actions since my return from leave and when it put me out on Section 72 leave, it was clear to me that the County no longer wanted me to work there." (*Id.*, ¶ 52). According to Plaintiff:

> I returned to work in a good faith effort to see if the work environment would change, however I was expressly told by Sharon Schaldone, in a meeting also attended by Patricia Auer and my two other supervisors, that 'nothing has changed.'
>
> The County's actions made it impossible for me to do my job. They also made it clear that they would attempt to use the Civil Service Law to push me out of my position. There was also a serious concern that, because of the County's actions in trying to use disciplinary procedures to push me out, I could lose my license. That concern was raised by the County's physician at my Section 72 evaluation.
>
> Therefore, once I was unequivocally told that nothing was going to change, I was forced to resign.

(Dkt. No. 45-14, ¶¶ 53–55).

In sum, based on Plaintiff's version of events, a jury could reasonably find that, upon her return from FMLA leave, the conditions of her employment severely deteriorated, including: (1) significantly increased scrutiny, including daily criticism of her charting by as many as three supervisors, and more supervision during home visits unrelated to clinical concerns; (2)

25

harassing comments from Ms. Schaldone related to her disability; and (3) forced, unpaid Section 72 leave without a prior medical exam, and a police escort from the building. (*See generally* Dkt. Nos. 1; 45-14; 45-16). Plaintiff states that during this time, and while she was on Section 72, "I became very distressed at the way the County was treating me and lost over 12 pounds, had anxiety and could not sleep." (Dkt. No. 45-14, ¶ 51). Plaintiff states that she felt that the County's actions forced her to resign, and if she did not, she would be forced out and could lose her nursing license.[3] (*Id.*, ¶¶ 53–54).

Moreover, Plaintiff's letter of resignation does not necessarily disprove her hostile work environment claim, as Defendant contends. (*See* Dkt. No. 40-13, p. 18). The mere fact that Plaintiff wrote a respectful resignation letter does not negate all of Plaintiff's complaints and prior reports of mistreatment and discrimination. Indeed, Plaintiff filed her EEOC Complaint complaining of a hostile work environment less than two months before her resignation, (*see* Dkt. No. 45-14, ¶ 13), and she began complaining to her supervisors about her treatment shortly after her return from FMLA leave in October 2012, (*see id.*, ¶¶ 5–8).

Altogether, Plaintiff has adduced evidence that, after she returned from FMLA leave, the Defendant created intolerable work conditions, and after she returned from Section 72 leave, she was told that "nothing has changed." (Dkt. No. 45-14, p. 29). The fact that Plaintiff resigned within *two working days* of her return from Section 72 leave further suggests that the conditions were unbearable. Crediting Plaintiff's version of events, there is at least an issue of fact as to whether a reasonable person in her position would have felt compelled to resign. In other words, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that

---

[3] It is also worth noting that the EEOC, in its determination, found that Plaintiff was subject to a hostile work environment based on her disability. (Dkt. No. 45-2, pp. 1–2).

the circumstances preceding Plaintiff's resignation amounted to a constructive discharge.

Moreover, given Schaldone's alleged comments about drinking, and the temporal proximity

between Plaintiff's FMLA leave, Section 72 leave, forced medical exam, and letter of

resignation, an inference of discrimination could be connected to the constructive discharge.

*See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996) (noting that "the

circumstances that give rise to an inference of discriminatory motive include actions or remarks

made by decisionmakers that could be viewed as reflecting a discriminatory animus," as well as

the "timing or sequence of events leading to the plaintiff's termination").

Therefore, Plaintiff has met her prima facie burden for this adverse action. *See

Chertkova*, 92 F.3d at 89–90 (finding that summary judgment was inappropriate where the

totality of circumstances could permit a finder of fact to conclude that the plaintiff was forced to

resign); *see also Brown v. Board of Educ. of City of New Berlin*, 107 F. Supp. 3d 232, 237 (D.

Conn. 2015) (denying summary judgment where factual allegations of coercion and harassment

may have been enough to cause a reasonable person to feel compelled to resign).

## 2. Legitimate, Non-Discriminatory Purpose

At the second step of the *McDonnell Douglas* analysis, the burden shifts to the employer

to "articulate some legitimate, nondiscriminatory reason" for the employee's treatment.

*McDonnell Douglas Corp.*, 411 U.S. at 802. "[T]he employer need only articulate—but need

not prove—the existence of a nondiscriminatory reason for its actions." *Texas Dep't of Cmty.

Affairs v. Burdine*, 450 U.S. 248, 254–56 (1981). This burden is satisfied if the defendant's

given reason, "taken as true, would permit the conclusion that there was a nondiscriminatory

reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993).

Thus, when a defendant produces some evidence of a legitimate reason for its employment

decision, the presumption of discrimination is rebutted, and the burden shifts back to the plaintiff. *Burdine*, 450 U.S. at 255.

In this case, Defendant contends that Plaintiff's alleged poor work performance was the legitimate, non-discriminatory reason for closer review and heightened scrutiny given Plaintiff, and her placement on Section 72 leave. (Dkt. No. 40-13, p. 27). Defendant also argues that Plaintiff's resignation was voluntary. (*Id.*, pp. 17–23). According to Defendant, "[t]he County's decision to monitor Plaintiff's work more closely was twofold: 1) she was a nurse for a particularly vulnerable population where errors could have life or death consequences; and 2) numerous mistakes were observed in Plaintiff's work prior to taking FMLA leave by the nurses covering Plaintiff's assigned clients." (*Id.*, p. 27). Defendant also states that "Plaintiff was simply monitored more closely because of her past mistakes and because she was transitioning from a phased-out program to a new program upon return from FMLA leave." (*Id.*). Moreover, Defendant's submissions indicate that their use of Section 72(5) resulted from the perception that Plaintiff's alleged poor performance represented a potential danger to patients under her care. (*See, e.g.*, Dkt. No. 40-5, pp. 2–3). There is at least some evidence in the record to support these performance issues. (*See*, *e.g.*, Dkt. Nos. 40-10, ¶ 10; 40-12, ¶¶ 5–7).

Accordingly, the Court finds that Defendant has satisfied its burden to show a legitimate, non-discriminatory reason for the adverse actions in this case. *See Duprey v. Prudential Ins. Co. of Am.*, 910 F. Supp. 879, 887 (N.D.N.Y. 1996) (holding that a plaintiff's "[f]ailure to perform her job duties to the satisfaction of her supervisors" was "a legitimate, nondiscriminatory reason for discharging her"); *see also Sutherland v. New York State Dep't of Law*, 216 F.3d 1073 (2d Cir. 2000) (recognizing the plaintiff's alleged poor performance as a legitimate non-discriminatory reason for termination).

### 3. Unlawful Discriminatory Pretext

At the third and final step, the plaintiff bears the ultimate burden of proving that the reason proffered by the employer was a pretext for unlawful discrimination. *St. Mary's Honor*, 509 U.S. at 516–18 ("inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced"). To survive a motion for summary judgment, the plaintiff must "establish a genuine issue of material fact . . . as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the [ ] decision." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir. 1994). In other words, the plaintiff must do more than show that the employer's reason is false, but must also, at the very least, "point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

In general, to demonstrate pretext, "a plaintiff may rely on evidence comprising [her] prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013). Pretext may be shown by, *inter alia*, "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate" non-discriminatory reasons for its action. *Id*. at 846. Further, "[w]hile departures from regular procedures 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision,' summary judgment is appropriate where 'whatever irregularities existed' were either unrelated to discrimination or 'did not affect the final [adverse] decision.'" *Hiramoto v. Goddard Coll. Corp.*, 684 F. App'x 48, 50 (2d Cir. 2017) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41, 45 (2d Cir. 2000)).

Here, Plaintiff attempts to show pretext by calling into question the reasons given by Defendant for the Section 72 leave and the circumstances surrounding her resignation. (Dkt. No. 45-16, pp. 21–22). Plaintiff contends that "there are numerous weaknesses and implausibilities in Defendant's proffered reasons for subjecting Plaintiff to heightened scrutiny and taking adverse action against her, particularly since she had been cleared to return to work by the medical providers most familiar with her disability – later confirmed by Defendant's own IME doctor." (*Id.*, p. 21). Plaintiff also challenges "Defendant's claims with respect to her alleged performance issues as being merely nitpicking, micromanagement, not actually reflecting material mistakes and as being part of a plan to force Plaintiff out of her position." (*Id.*, pp. 21–22). Further, Plaintiff contends that she did not engage in any alcohol-related misconduct while working for the County and that Defendant's papers provide "no proof beyond its own discriminatory speculation that Plaintiff had any performance issues as a result of her disability." (*Id.*, pp. 19–20).

The record shows that Plaintiff worked as a nurse for the County for more than a decade, and prior to taking FMLA leave, she had never received a poor performance review or been disciplined for misconduct. (Dkt. No. 45-14, ¶ 23). Then, upon her return from FMLA leave, Plaintiff was subjected to increased scrutiny and criticism from supervisors unlike she had ever received before. (*Id.*). Although Defendant alleges that Plaintiff's own poor work performance triggered this criticism and supervision, Plaintiff has challenged the County's characterization of her performance, and she contends that the alleged charting issues "were merely clerical issues or caused by the delay in having to wait for [her] supervisors to sign off on [her] documentation." (Dkt. No. 45-14, ¶¶ 29–33). Moreover, Plaintiff states that Ms. Schaldone would criticize her work, even after it had been approved by two other supervisors. (*Id.*, ¶ 36).

30

Plaintiff further states that when she was assigned supervisors to accompany on her visits, "I specifically asked if there were any clinical concerns. Both Patricia Auer and Valerie Whisenant told me there were not." (*Id.*, ¶ 32). Thus, there is some evidence to show weaknesses and inconsistences in the performance-related reason given by Defendant.

Further, the alleged comments by Ms. Schaldone about drinking could be viewed as showing that Plaintiff's alcoholism, and not her performance, was the real reason for the Section 72 leave and constructive discharge. According to Plaintiff, right after the October 22nd meeting about Plaintiff's performance, Ms. Schaldone allegedly made comments about drinking martinis, which were directed at Plaintiff, a recovering alcoholic. (Dkt. No. 45-14, ¶ 46). Plaintiff also states that when she complained directly to her supervisors that she felt the County was attempting to force her out of her position, Ms. Schaldone responded in a dismissive and aggressive tone. (*Id.*, ¶ 6).

As discussed above, the County placed Plaintiff on leave in December 2012 without first conducting a medical exam, a departure from the typical procedural requirements under Section 72(1). *See* N.Y. Civ. Serv. Law § 72(1) (stating that: "If, upon [ ] medical examination, [a] medical officer shall certify that such employee is not physically or mentally fit to perform the duties of his or her position, the appointing authority shall notify such employee that he or she may be placed on leave of absence."). Because Section 72 involves significant due process implications, New York courts have held that strict compliance with its procedures is required. *Williams v. Troiano*, 129 A.D.3d 1601, 1603 (4th Dep't 2015) (citing *Breen v. Gunn*, 137 A.D.2d 685, 685 (2d Dep't 1988). Moreover, Section 72(5) has been called an "emergency exception" to the typical procedure under Section 72(1), requiring an "emergency situation."

*Breen*, 37 A.D.2d at 686 (ordering reinstatement of a municipal employee where the "record [did] not support the appellant's reliance on the emergency exception of [Section 72(5)]").

The County's Section 72(5) letter dated, dated December 6, 2012, states that Plaintiff's "continued presence on the job represents a potential danger to other persons or property or would severely interfere with department operations." (Dkt. No. 40-5). Director Auer states that the she was "concern[ed] that Plaintiff had relapsed," and that the County was concerned about its liability. (Dkt. No. 40-10, ¶ 12). But at the time of the Section 72 leave, Plaintiff had recently been medically cleared to return from FMLA leave, with a medical exam on October 9, 2012, and she was quickly cleared to return to work again by the County-appointed physician on January 21, 2013. (Dkt. Nos. 45-7; 45-8; 45-8; 45-14, ¶¶ 19–20, 40, 50). Thus, there is at least some evidence to suggest that there was no emergency, and that Defendant's invocation of Section 72(5), rather than Section 72(1), may have been improper.

Finally, the record demonstrates an overall temporal proximity between Plaintiff's FMLA leave (which was based on her disability), her involuntary Section 72 leave, and her resignation. Plaintiff was placed on Section 72 leave without pay on December 6, 2012, less than two months after her return from FMLA leave. (Dkt. No. 40-20, ¶¶ 10–11). She resigned two working days after her return from Section 72 leave in January 2013. (Dkt. No. 40-2, p. 2). Despite the County's professed concerns about her health and work performance, Plaintiff was determined fit to work by two doctors, in October 2012 and January 2013. (*See* Dkt. No. 45-14, ¶¶ 40, 50).

Viewing the facts in the light most favorable to Plaintiff, there is evidence of discriminatory pretext based on the allegedly unprecedented and unfounded work criticism and supervision, the allegedly discriminatory comments by Plaintiff's supervisor Ms. Schaldone, the possible procedural irregularity with the medical exam, and the temporal proximity in the

sequence of events from Plaintiff's FMLA leave to Section 72 leave to resignation. Accordingly, a reasonable jury could find that the reasons given by Defendant were pretextual for an underlying discriminatory motive based on Plaintiff's disability.

Therefore, Plaintiff has satisfied her burden at step three of the *McDonnell Douglas* test, and Defendant's motion for summary judgment on Plaintiff's ADA discrimination claim must be denied. *See Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 251–53 (D. Conn. 2013) (denying summary judgment on an ADA discrimination claim where resolution would involve "an assessment of the credibility of witnesses and the resolution of competing inferences that can be drawn from disputed facts"); *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 342–43 (D. Conn. 2016) (denying summary judgment where record evidence surrounding employee's dismissal for alleged performance problems created a genuine issue of fact as to whether employer's reasons were pretext for discrimination).

### B. Hostile Work Environment Claim

As discussed above, (*see supra* note 2), a hostile work environment claim is implied by Plaintiff's allegations in the Complaint, (*see generally* Dkt. No. 1). Plaintiff alleges that Defendant discriminated against her "when it created a hostile work environment by scrutinizing Plaintiff's every move, subjecting her to unreasonable levels of scrutiny, interfering with her ability to do her job, requesting additional medical documentation despite having already been provided with suitable documentation, placing Plaintiff on involuntary leave and ordering her for fitness for duty evaluations as a condition of employment when she already had been cleared to return to work." (Dkt. No. 1, ¶ 36). Defendant argues that Plaintiff's hostile work environment claim must fail for largely the same reasons as her constructive discharge-related discrimination claim. (Dkt. No. 40-13, p. 16).

To survive summary judgment on her hostile work environment claim, "a plaintiff must produce evidence that the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004). Notably, this standard is not as high as for constructive discharge based on a hostile work environment. *See Fincher*, 604 F.3d at 725. As discussed above, Plaintiff has adduced sufficient evidence for a reasonable jury to find that she was constructively discharged due to a hostile work environment. For the same reason, Plaintiff may also sustain a separate claim for hostile work environment.

## C. ADA Retaliation Claim

Plaintiff's Complaint further alleges that the County retaliated against her for: (1) requesting and taking FMLA leave; and (2) filing an EEOC complaint. (*See* Dkt. No. 1, ¶¶ 45–46). Retaliation claims brought under the ADA are examined under the three-step *McDonnell Douglas* burden-shifting framework. *Treglia*, 313 F.3d at 719. At the first step, Plaintiff must establish a prima facie case, which requires her to show that: (1) she engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity. *Treglia*, 313 F.3d at 719. Again, the prima facie showing is *de minimis*. *Id*. "Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Id*. at 721. "If a defendant meets this burden, 'the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" *Id*. (quoting *Cifra v. G.E. Co*., 252 F.3d 205, 216 (2d

Cir. 2001)).  The Court will assess Plaintiff's retaliation claim at each step, first for the FMLA leave, and then for the EEOC Complaint.

## 1. FMLA Leave

### A. Prima Facie Case

First, the parties do not dispute that Defendant was aware that Plaintiff requested and took FMLA leave, or that the FMLA leave was a protected activity.  (*See* Dkt. Nos. 40-13, p. 32; 45-16, p. 25).  Moreover, as discussed above, Plaintiff has established that her involuntary, unpaid Section 72 leave/medical exam and constructive discharge qualify as adverse employment actions under the ADA.  Therefore, the only remaining issue for Plaintiff's prima facie case as to her retaliation claim based on the FMLA leave is whether a causal connection exists between the FMLA leave and the adverse actions.

The Second Circuit "has consistently held that proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  Moreover, close temporal proximity alone may be enough at the prima facie stage.  *See Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 101 (D. Conn. 2018) (citing *Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) ("In the absence of direct evidence, the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.")).

Defendant mainly argues that Plaintiff cannot show causation because she never mentioned retaliation in her resignation letter.  (Dkt. No. 40-13, p. 32).  Specifically, Defendant

contends that: "Nowhere in Plaintiff's resignation letter does she allege that she is being retaliated against because she took FMLA leave. Furthermore, Plaintiff made no mention in her January 28, 2013 resignation letter of any complaints of or concerns about retaliation." (*Id*.). Plaintiff responds by asserting that: "I had worked at the County for many years and provided the courtesy of a respectful resignation letter reflecting the fact that I enjoyed my work there, when I was permitted to do it. Given the fact that I had already made numerous verbal and written complaints and filed a formal complaint with the EEOC of which the County was aware at that point, I did not see the need to include any complaints in a letter of resignation." (Dkt. No. 45-14, ¶ 56). As discussed above, the resignation letter does not negate Plaintiff's previous complaints.

The record contains evidence of temporal proximity between the FMLA leave, the Section 72 leave, and the constructive discharge, as Plaintiff points out. (Dkt. No. 45-16, p. 27). According to Plaintiff, the conditions at work severely deteriorated right after she returned from FMLA leave. (*See*, *e.g*., Dkt. No. 45-14, ¶¶ 35–39, 45–47). Plaintiff contends that "Defendant started to lay the groundwork for her placement on leave and eventual termination by subjecting her to performance counselling, heightened scrutiny, nitpicking and micromanagement." (Dkt. No. 45-16, p. 27). Just two months later, she was put on involuntary, unpaid Section 72 leave. (Dkt. No. 40-5). Then, only two days after Plaintiff returned from Section 72 leave, with conditions unchanged, she says she felt compelled to resign. (Dkt. No. 45-14, ¶ 55). Moreover, the record indicates that Director Auer considered implementing the Section 72 process prior to Plaintiff's return from FMLA leave, and before Plaintiff was even notified of any of the alleged performance problems. (Dkt Nos. 40-10, ¶ 11; 40-6, p. 2). This may suggest that the County was preparing to initiate Plaintiff's involuntary medical leave even before the County had

documented many of the performance issues that they now rely on as the basis for placing her on Section 72 leave. (*See* Dkt. No. 40-10, ¶ 10). Finally, there is evidence that in November 2012, just a month after her return from FMLA leave, Plaintiff requested a copy of her employment file "[b]ecause of what was going on at work," and Ms. Schaldone said, in Plaintiff's presence, "Now she wants her employment record. I have spent enough time on this shit.'" (Dkt. No. 45-14, ¶ 47). This comment could be viewed as expressing aggravation with Plaintiff based on her FMLA leave and potentially retaliatory animus.

Altogether, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find a causal connection between Plaintiff's protected activity of taking FMLA leave and her placement on Section 72 leave and subsequent constructive discharge. Accordingly, Plaintiff has met her burden to show a prima facie case of retaliation based on the FMLA leave.

### B. Legitimate, Non-Retaliatory Purpose

As with Plaintiff's discrimination claim, Defendant appears to argue that Plaintiff's alleged poor work performance was the legitimate, non-retaliatory reason for Plaintiff's subjection to closer review, heightened scrutiny, and Plaintiff's placement on Section 72 leave. (Dkt. Nos. 40-13, pp. 31–33; 50, pp. 13–14). The County cited this poor work performance, along with Plaintiff's disability, as the reason for putting her on Section 72 leave. (Dkt. No. 40-5). There is some evidence of poor work performance, as discussed above. (*See*, *e.g.*, Dkt. Nos. 40-10, ¶ 10; 40-12, ¶¶ 5–7). Accordingly, Defendant has met its burden to produce evidence that the alleged adverse employment actions were justified and non-retaliatory.

### C. Unlawful Retaliatory Pretext

Finally, at the third step, "the plaintiff must point to evidence that would reasonably permit a rational factfinder to conclude that the employer's explanation is merely a pretext for

impermissible retaliation." *Treglia*, 313 F.3d at 721 (citing *Cifra*, 252 F.3d at 216). Here, Plaintiff again points to "close temporal proximity between Plaintiff's protected activity and Defendant's adverse actions," and she argues that "there are inconsistencies and implausibilities related to Defendant's proffered reasons for its treatment of Plaintiff which demonstrate they are pretextual." (Dkt. No. 45-16, p. 28).

As discussed above, there is a question of fact as to whether Plaintiff's work performance deteriorated after she returned from FMLA leave, and if so, for what reason. Among other things, it is notable that, according to Plaintiff, Director Auer mischaracterized her performance, Schaldone would criticize her work even after two other supervisors signed off, and both Director Auer and Ms. Whisenant would accompany Plaintiff to visits even though they did not have "clinical concerns." (*See generally* Dkt. No. 45-14). Moreover, Director Auer directly attributes Plaintiff's alleged performance issues to a suspected "relapse," (Dkt. No. 40-10, ¶ 12), while Ms. Schaldone states that Plaintiff's performance issues were not related to her medical condition at all, (*see* Dkt. No. 45-10, p. 30:1–4). This further calls into question Defendant's explanation that the Section 72 leave was necessary to address Plaintiff's "disability-caused" performance issues. (*See* Dkt. No. 40-13, pp. 23–25). There is also evidence that the alleged retaliatory treatment began immediately after Plaintiff's return from FMLA leave in October 2012 and continued until her resignation in January 2013. (*See generally* Dkt. No. 45-14). This close temporal proximity between Plaintiff's return from FMLA leave and her placement on Section 72 leave may also suggest retaliatory intent. *See Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 495–96 (S.D.N.Y. 2009) (reasoning that a one-month period between a protected action and an adverse employment action was relevant in establishing a causal connection). It is also worth noting that Director

38

Auer began considering placing Plaintiff on Section 72 leave in August 2012, just one month after she took FMLA leave in July 2012. Finally, there is Ms. Schaldone's alleged comment, "I have spent enough time on this shit," referring to Plaintiff's employment file, possibly including her FMLA leave. (Dkt. No. 45-14, ¶ 47).

In sum, there is at least some evidence showing inconsistencies in the reasons given by Defendant for the adverse actions in this case. When combined with the close temporal proximity between Plaintiff's protected activity and the adverse actions, and the comment from Schaldone, a reasonable jury could find that Defendant's reasons were merely pretextual and that Defendant retaliated against Plaintiff for taking FMLA leave. Therefore, Plaintiff has met her burden at the final stage of the *McDonnel Douglas* analysis, and her retaliation claim based on FMLA leave may proceed. *See Hopkins*, 985 F. Supp. 2d at 253–55 (denying summary judgment on retaliation claim where plaintiff's proffered evidence of raised issues of fact as to the employer's pretextual motive); *EEOC v. Day & Zimmerman NPS, Inc.*, 265 F. Supp, 3d 179, 199–203 (D. Conn. 2017) (denying summary judgment on retaliation claim where employer's conduct and close temporal proximity between protected activity and adverse employment action created a genuine issue of material fact as to pretextual motive); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 90 (2d Cir. 2010) (finding that the "record is sufficient to raise a question of pretext" regarding employer's action because of discrepancies between "defendants' proffered rationale" and the facts); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 432, 444–46 (E.D.N.Y. 2009) (denying summary judgment where temporal proximity between protected activity and alleged adverse action created an issue of fact).

## 2. EEOC Complaint

### A. Prima Facie Case

Regarding Plaintiff's retaliation claim based on her EEOC complaint, the parties do not dispute that Plaintiff's filing of an EEOC complaint ordinarily qualifies as a protected activity. (*See* Dkt. Nos. 40-13, p. 31; 45-16, p. 25). Therefore, the remaining issues related to Plaintiff's prima facie case are: (1) whether the County was aware of Plaintiff's complaint; and (2) whether the County took adverse employment action against Plaintiff because of her protected activity. *See Treglia*, 313 F.3d at 719.

First, the record shows that during the October 22 meeting, Plaintiff's family member informed Director Auer of Plaintiff's intention to file an EEOC complaint. (*See* Dkt. Nos. 45-9, pp. 40–41:24–12; 45-14, ¶¶ 13, 17). Therefore, Plaintiff has established that Defendant was at least aware of her intent to file a complaint with the EEOC, and for purposes of this motion, the Court will assume that is sufficient for Plaintiff's prima facie case.

Next, Defendant argues that Plaintiff cannot show causation because "[t]he County first received Plaintiff's EEOC complaint [ ] six days after the County had notified Plaintiff that she was being placed on Section 72 leave." (Dkt. No. 40-13, p. 32). However, as discussed above, Plaintiff's placement on involuntary, unpaid Section 72 leave came less than two months after Defendant was informed of her intent to file an EEOC complaint. (*See* Dkt. Nos. 45-9, pp. 40–41:24–12; 45-14, ¶¶ 13, 17). Under the circumstances, this close temporal proximity is enough to suggest a causal connection, and therefore, Plaintiff has met her *de minimis* burden to establish a prima facie case for ADA retaliation claim based on the intention to file an EEOC complaint.

## B. Legitimate, Non-Retaliatory Purpose

As noted above, the record contains some evidence of poor work performance sufficient to support a legitimate, non-retaliatory reason for Plaintiff's subjection to closer review, heightened scrutiny, and Plaintiff's placement on Section 72 leave. (*See*, *e.g.*, Dkt. Nos. 40-10, ¶ 10; 40-12, ¶¶ 5–7; 40-13, pp. 31–33; 50, pp. 13–14). Accordingly, Defendant has satisfied its burden to show a legitimate, non-retaliatory reason for the adverse actions in this case.

## C. Unlawful Retaliatory Pretext

At the last step, Plaintiff's retaliation claim based on her intention to file an EEOC Complaint falls short because she has not adduced any evidence that the EEOC Complaint was the real reason for the adverse actions. Unlike with Plaintiff's FMLA retaliation claim, there is no evidence that her work conditions worsened after her protected activity (the threatened EEOC complaint), or that the County ever discouraged her from filing a complaint in any way. Nor is there any evidence of comments or remarks from supervisors referencing the EEOC Complaint. Given the lack of additional factual support for this claim, mere temporal proximity is insufficient. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."); *Simpson v. N.Y.S Dep't of Civil Servs.*, 166 Fed. App'x 499, 502 (2d Cir. 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). In sum, no reasonable jury could find that Plaintiff's intent to file an EEOC complaint motivated the County's alleged adverse employment actions or that there was a causal connection between them.

Accordingly, Plaintiff's ADA retaliation claim based on her EEOC complaint cannot survive summary judgment.

## V.  CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 40) is **GRANTED** in part, and **DENIED** in part; and it is further

**ORDERED** that Plaintiff's retaliation claim based on her EEOC Complaint is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's remaining claims may proceed as specifically discussed in this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:  March 7, 2019
      Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge